# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    :
               :
  Plaintiff,        :   Civil Action No.:  13-00265 (RC)
               :
  v.          :   Re Document Nos.:  46, 47
               :
JAMES W. PRESTON, *et al.*,    :
               :
  Defendants.       :

## MEMORANDUM OPINION

### DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
### DENYING DEFENDANT JAMES W. PRESTON'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

The United States of America (the "Government") filed this civil action against

Defendants James W. Preston and his wife, Nancy Preston, seeking to avoid certain transfers of

property as fraudulent pursuant to the Federal Debt Collection Procedures Act ("FDCPA"), 28

U.S.C. §§ 3301 *et seq.*

From approximately 1992 until September 2011, Nancy Preston was the Corporate

Controller for Clyde's Restaurant Group ("Clyde's").  *See* Statement of the Offense at 1, *United*

*States v. Preston*, No. 12-cr-00189 (RC) (D.D.C. Sept. 26, 2012) ("Crim."), ECF No. 6.  In 2012,

Ms. Preston was convicted of mail fraud in violation of 18 U.S.C. § 1841 in this Court, and, as

part of her sentence, this Court ordered Ms. Preston to pay restitution in the amount of $239,069

and a fine of $62,000 to the United States.  *See* Judgment, Crim. ECF No. 25.  Prior to her

conviction and entry of the money judgment, Ms. Preston transferred her interest in real property

that was jointly owned by herself and her husband, as well as certain cash and securities that she

held, to Mr. Preston.  The Government filed this civil action against Mr. and Ms. Preston seeking

to avoid those transfers as fraudulent.  During this litigation, the transferred cash and securities were also the subject of an ancillary forfeiture proceeding in Ms. Preston's criminal case, which this Court resolved in favor of the Government.  *See* Order, Crim. ECF No. 74; Order, Crim ECF No. 77.

Now before the Court are cross-motions for summary judgment filed by the Government and Mr. Preston.  *See* Def.'s Mot. Summ. J., ECF No. 46; Pl.'s Mot. Summ. J., ECF No. 47.  Ms. Preston, proceeding *pro se* in this case, has not moved for summary judgment and has not filed any response to the present cross-motions for summary judgment.  For the reasons explained below, the Court will deny both parties' motions.

## II.  FACTUAL BACKGROUND

Upon consideration of the evidentiary record submitted by the parties, the Court finds that the following relevant facts have been established or are not in dispute, except where noted as a party's claim or a disputed fact.

### A.  Mr. Preston's Acquisition of the Windover Property and Conveyance in 2008

In August 1984, Mr. Preston purchased real property located at 295 Windover Avenue N.W., Vienna, Virginia 22180 (the "Windover Property").  *See* Def.'s Stmt. Undisputed Material Facts ("Def.'s SOF") ¶ 14, Def.'s Mem. Supp. Mot. Summ. J., ECF No. 46-1.[1]

Mr. and Ms. Preston married over 20 years later, on December 30, 2004.  *See* Pl.'s Stmt. Material Facts Not in Genuine Dispute ("Pl.'s SOF") ¶ 2, ECF No. 47-2.  Nearly four years later, on November 25, 2008, Mr. Preston executed a Deed of Gift conveying the Windover Property

---

[1]     Mr. Preston included his Statement of Undisputed Material Facts as a section of his memorandum in support of his motion for summary judgment.  *See* Def.'s Mem. Supp. at 3–6. The Court's references to "Def.'s SOF" refer to this section by paragraph.

to Ms. Preston and himself as tenants by the entirety.  *See* Def.'s Mot. Summ. J. Ex. 13 (the "2008 Deed of Gift"), ECF No. 46-14.  The text of the 2008 Deed of Gift states that the property was conveyed "without consideration" and, near the top of the document, it states that consideration is "None."  *Id.*  It also states that the conveyance is "Exempt from Recordation Tax under § 58.1-811.D of the Code of Virginia," which concerns deeds of gift without consideration.  *Id.*  It also states that the property's assessment was $789,270.00.  *Id.*  The parties sharply dispute the terms and circumstances of this conveyance.

Mr. and Ms. Preston submit sworn affidavits claiming that, despite the language in the 2008 Deed of Gift, the conveyance was part of an agreement between them that Ms. Preston would, at some future point in time, pay Mr. Preston for her joint interest.[2]  *See* Aff. James Preston (Feb. 19, 2015), Def.'s Mot. Summ. J. Ex. 2 ("Mr. Preston's Feb. 2015 Aff.") ¶¶ 19–20, ECF No. 46-3; Aff. Nancy Preston (Feb. 19, 2015), Def.'s Mot. Summ. J. Ex. 12 ("Ms. Preston's Feb. 2015 Aff.") ¶¶ 18–19, ECF No. 46-13.  Mr. Preston states:

> Nancy Preston and I agreed that in exchange for placing Nancy Preston's name on the title to the [Windover] Property, Nancy Preston would pay me the value of her Clyde's stock (which was seized by the Government) and the funds from the sale of a property in Falls Church, Virginia, which sums were held in her Merrill Lynch accounts.  She would pay this amount at the time that we combined our finances, which never occurred.

---

[2]      The Prestons' present description of their 2008 agreement is somewhat different from how Ms. Preston described the agreement in a sworn declaration that she filed in her criminal case (though captioned for this case) nearly two years earlier, in which she stated that Mr. Preston conveyed the Windover Property "conditioned upon my payment to Mr. Preston of ½ the value" of the Windover Property.  *See* Decl. Nancy A. Preston (Mar. 28, 2013), Pl.'s Mot. Summ. J. Ex. G ¶ 6, ECF No. 48-7.  Here, the Prestons do not claim that the conveyance was conditional upon Ms. Preston's payment.

Mr. Preston's Feb. 2015 Aff. ¶ 19.  He further states that he conveyed his interest to himself and

Ms. Preston "with the understanding that she would pay me for that interest in accordance with

our agreement."  *Id.* ¶ 20.  Similarly, Ms. Preston states:

> James Preston and I agreed that in exchange for placing my name
> on the title to the [Windover Property], I would pay James Preston
> the value of my Clyde's stock (which was seized by the
> Government) and the net proceeds from the sale of a property I
> separately owned in Falls Church, Virginia that I acquired before
> my marriage to Mr. Preston, which sums were held in my Merrill
> Lynch accounts.  I intended to pay these amounts at the time that we
> combined our finances, which never occurred.   In fact, James
> Preston and I still have not combined our finances.

Ms. Preston's Feb. 2015 Aff. ¶ 18.  The Prestons claim that they kept (and still keep) their

finances separate, although they had planned to combine them.  *See* Mr. Preston's Feb. 2015 Aff.

¶ 19; Ms. Preston's Feb. 2015 Aff. ¶ 18.  Neither Mr. Preston nor Ms. Preston claim that they

had agreed upon any specific amount that Ms. Preston would pay or any consequences in the

event that Ms. Preston did not or could not pay.  They do not provide the Court with any

contemporaneous evidence of their agreement or statements from any third party witnesses with

knowledge of the agreement.  They also do not provide any explanation as to why the deed was

recorded as a deed of gift or why it consistently refers to the conveyance as being without

consideration.

The Government disputes the Prestons' factual claim, largely relying on the 2008 Deed of

Gift's statement that there was no consideration for the conveyance.  *See* Pl.'s Mem. Supp. Mot.

Summ. J. at 18–19, ECF No. 47-1.  The Government also points to the deposition testimony of

Victoria Griffith, a former co-worker of Ms. Preston who was terminated in connection with

Clyde's investigation into Ms. Preston's criminal conduct.  *See* Victoria Griffith Dep. Tr. (Jan.

23, 2015) at 13:6–18, Pl.'s Mot. Summ. J. Ex. E ("Griffith Dep."), ECF No. 48-5.[3]  Ms. Griffith

testified that she had at least one conversation with Ms. Preston in which Ms. Preston discussed

plans to refinance the Windover Property in order to construct an additional garage and an

apartment on the property and she estimated that those conversations took place around late

2008.  *See id.* at 27:18–28:9.  Ms. Griffith also testified that the Prestons' decision to place Ms.

Preston's name on the title to the Windover Property occurred around the same time.  *See, e.g.,*

*id.* at 28:11–15.  When asked what Ms. Preston told her about this decision, Ms. Griffith testified

that Ms. Preston said, "We refinanced the house, and it's done, and we're moving forward on the

construction," and that Ms. Preston "elaborate[d] to me that it was – you know, she was happy

that her – she was a part of the house now."  *Id.* at 33:18–33:25.  Ms. Griffith does not appear to

have given testimony concerning the purpose of the conveyance or whether there was any

consideration or other agreement.  The Prestons dispute Ms. Griffith's testimony, both stating

that they never discussed the Windover Property with her at any time.  *See* Aff. Nancy Preston

(Apr. 17, 2015) ¶ 5, Def.'s Opp. Pl.'s Mot. Summ. J. Ex. 4 ("Ms. Preston's Apr. 2015 Aff."),

ECF No. 50-5; Aff. James Preston (Apr. 17, 2015) ¶ 10, Def.'s Opp. Pl.'s Mot. Summ. J. Ex. 3

("Mr. Preston's Apr. 2015 Aff."), ECF No. 50-4.

### B.  Confession and Transfers of Cash and Securities in Early 2012

On January 9, 2012, Ms. Preston confessed to agents of the Federal Bureau of

Investigation ("FBI") that she had embezzled more than $600,000 from Clyde's, and this

interview began a process that led to Ms. Preston retaining a criminal defense attorney to

represent her, meeting with the U.S. Attorney's Office, and ultimately pleading guilty to mail

---

[3]     For ease of reference, the Court's citations to deposition transcripts are to the page and
line numbers of the transcripts, rather than the page numbers of the exhibits.

fraud.  *See* Stip. Regarding Testimony SA Mark Stanley, Def.'s Mot. Summ. J. Ex. 14, ECF No. 46-15.

Eleven days later, on January 20, 2012, Ms. Preston made two cash transfers from an account she held at Merrill Lynch, one transfer of $6,000 and another transfer of $5,500 (the "Cash"), to a Merrill Lynch account held by Mr. Preston.  *See* Def.'s SOF ¶ 3.  Three days after that, on January 23, 2012, Ms. Preston transferred certain securities valued at $190,529.27 (the "Securities") from her same Merrill Lynch account to a different Merrill Lynch account held by Mr. Preston.  *See id.* ¶ 4.

Ms. Preston claims that she made these transfers because two Merrill Lynch representatives told her that she "would no longer be able to maintain accounts at Merrill Lynch" and claims that she had no "intent to hinder, delay or defraud the Government."  Ms. Preston's Feb. 2015 Aff. ¶¶ 4–5.  Mr. Preston supports her claim.  *See* Mr. Preston's Feb. 2015 Aff. ¶ 5. The Prestons also claim that, in making the transfers to Mr. Preston, Ms. Preston "instructed [Mr. Preston] to use the transferred funds to satisfy her personal financial obligations, including her restitution obligations to the Government arising from her plea agreement."  *Id.* ¶ 9.  *See also* Ms. Preston's Feb. 2015 Aff. ¶ 8.  The Government challenges these claims, providing a sworn declaration by an in-house counsel to Merrill Lynch stating that "[a]t no time did Merrill Lynch ask Mrs. Preston to close" her account and that Merrill Lynch continued to maintain Ms. Preston's account for over two-and-a-half years until it was "purged from the Merrill Lynch system following thirteen months of inactivity" on August 30, 2014.  Decl. Greg Rose ¶ 1, Pl.'s Mem. Opp. Def.'s Mot. Summ. J. Ex. B ("Rose Decl."), ECF No. 51-4.  Neither party provides

any testimony from the Merrill Lynch representatives that actually met with Ms. Preston.[4]  It is

clear, however, that Ms. Preston's account continued to remain open and active for at least nine

months following the transfers, as Mr. Preston paid Ms. Preston's attorneys on her behalf from

Ms. Preston's account in March 2012 and as late as October 5, 2012.  *See* Mr. Preston's Feb.

2015 Aff. ¶¶ 11–14.

On February 7, 2012, the Securities, along with other securities held in Mr. Preston's

account, were transferred to a separate Merrill Lynch account held by the James W. Preston

Trust (the "Trust").  *See* Def.'s SOF ¶ 4; Decl. Mary McAllister, Pl.'s Mot. Summ. J. Ex. A

("McAllister Decl.") at 22–28, ECF No. 48-1.  The Prestons do not provide any explanation for

this transfer.[5]  Documents indicate that the Trust was formed by an agreement dated January 20,

2012, the same day that Ms. Preston transferred the Cash to Mr. Preston's account, and that Mr.

Preston is the grantor of the Trust and its sole trustee.  *See* McAllister Decl. ¶ 9; *id.* at 29–30.

### C.  Transfer of the Windover Property in April 2012

On April 4, 2012, Mr. and Ms. Preston executed a Deed of Gift conveying their joint

interest in the Windover Property to Mr. Preston "for his sole and equitable estate," removing

Ms. Preston's name from the title.  *See* Deed of Gift dated April 4, 2012 ("2012 Deed of Gift"),

Pl.'s Mot. Summ. J. Ex. F ("Title Report") at 6–8, ECF No. 48-6.  The text of the 2012 Deed of

Gift states that the property was conveyed "in consideration of the sum of Ten Dollars ($10.00),"

---

[4]     Mr. Preston's counsel states in reply that Merrill Lynch's in-house counsel would not permit her to interview the representative referenced in his declaration.  *See* Aff. Mariam W. Tadros, Def.'s Reply Pl.'s Opp. Def.'s Mot. Summ. J. Ex. 2, ECF No. 52-2.  But it is unclear why neither party deposed her during the discovery period.

[5]     The Prestons' affidavits state that the reason for "these transfers," seemingly including the transfer to the Trust Account, was that Merrill Lynch representatives told Ms. Preston that she needed to close her account.  *See* Ms. Preston's Feb. 2015 Aff. ¶ 4; Mr. Preston's Feb. 2015 Aff. ¶ 4.  But this fails to explain why the Securities were transferred from Mr. Preston's account to the Trust's account weeks later.

but, near the top of the document, it states that consideration is "None." *Id.* at 6–7.  It states that the Windover Property's assessment was $934,370.00.  *See id.* at 6.  It also states that the conveyance is exempt from Virginia's recordation tax "as a transfer pursuant to a written incident to a divorce," *id.*, but the Prestons have stated that this "appears to be a typo or mistake by the closing agent."  Answer of James Preston at 2 ¶ 8, ECF No. 24; Answer of Nancy Preston at 2 ¶ 8, ECF No. 25.  The Prestons remained married, and Ms. Preston continued to reside at the Windover Property.  *See* Nancy Preston Dep. Tr. (Jan. 10, 2013) at 6:4–10, Pl.'s Mot. Summ. J. Ex. I ("Nancy Preston Dep."), ECF No. 48-9.

The Prestons claim that Ms. Preston transferred her interest in the Windover Property back to Mr. Preston because she did not fulfill her part of the original agreement in 2008 to pay Mr. Preston for her interest.[6]  Ms. Preston states that she and Mr. Preston never combined their finances as they originally intended and that, rather than pay Mr. Preston for her interest, she "instead opt[ed] to use the sums in my Merrill Lynch accounts and my Clyde's stock to pay the Government and my attorneys."  Ms. Preston's Feb. 2015 Aff. ¶¶ 18–20.  She further states: "When I realized that I would not be able to pay for the interest in the [Windover] Property, James Preston and I decided to remove my name from the title to the [Windover] Property."  *Id.* ¶ 21.  Mr. Preston supports his wife's claim.  *See* Mr. Preston's Feb. 2015 Aff. ¶¶ 21–23.  The Prestons do not provide the Court with any contemporaneous evidence or statements from any third party witnesses regarding Ms. Preston's reason for making the transfer or the consideration Ms. Preston received for the transfer or explain why the deed was recorded as a deed of gift.

---

[6]     Ms. Preston gave a slightly different explanation two years ago in her declaration in the criminal case, attributing the transfer not only to her inability to pay for her interest but also to "a result of a refinance of the mortgage and credit line on [the Windover] Property to take advantage of record low interest rates."  Ms. Preston's 2013 Decl. ¶ 8.  The Prestons do not offer the latter explanation here.

As support for the claim that they kept their finances separate, the Prestons claim that, during the time that she held joint title and after the transfer in April 2012, Ms. Preston never made any payments to the mortgage on the Windover Property or made any capital improvements to the property and instead paid Mr. Preston $2,500 per month for various "household expenses including food, clothing, utilities, gasoline, personal property taxes, and travel expenses."  Mr. Preston's Feb. 2015 Aff. ¶¶ 23–25; Ms. Preston's Feb. 2015 Aff. ¶¶ 23–24.  *See also* Ms. Preston's 2013 Decl. ¶ 9.  In support, Mr. Preston provides copies of checks for $2,500 each for each month from April 2011 through November 2012 (except February 2012) signed by Ms. Preston made to and endorsed by Mr. Preston.  *See* Def.'s Mot. Summ. J. Ex. 16, ECF No. 46-17.

The Government challenges the Prestons' explanation for the transfer, pointing towards the language of the 2008 Deed of Gift, which states that there was no consideration, and the language of the 2012 Deed of Gift, which references only nominal, if any, consideration.  The Government also challenges the Prestons' claims regarding the separation of their finances, providing evidence that many of Ms. Preston's bank accounts, including the Bank of America account she used to pay Mr. Preston each month, were joint accounts in both of their names.  *See* Decl. Charles Ross, Pl.'s Mem. Opp. Ex. A ("Ross Decl."), ECF No. 51-3.  The Government also argues that the timing between the monthly payments from Ms. Preston to Mr. Preston and Mr. Preston's monthly payment of the mortgage suggests that Ms. Preston's checks could have been intended for the mortgage payments.  *See* Pl.'s Mem. Supp. at 7; Pl.'s Opp. at 16–17.

### D.  Conviction and Partial Restitution Payment in Late 2012

On August 29, 2012, the Government filed a Criminal Information against Ms. Preston in this Court, and on September 26, 2012, Ms. Preston pleaded guilty to mail fraud in violation of

18 U.S.C. § 1341.  *See* Information, Crim. ECF No. 1; Crim. Minute Entry (Sept. 26, 2012).  On

September 26, 2012, the Court entered a Consent Order of Forfeiture forfeiting $389,069 to the

United States in the form of a money judgment.  *See* Consent Order of Forfeiture, Crim. ECF

No. 9.

In November 2012, securities held by the Trust were liquidated and, from the proceeds of

the liquidation, $150,000 was paid from the Trust Account and ultimately to the Government in a

pre-judgment partial payment of Ms. Preston's restitution obligation.  *See* Def.'s SOF ¶ 5; Pl.'s

Response Def.'s SOF ¶ 5; Am. Compl. ¶ 12, ECF No. 23.  On December 3, 2012, the

Government filed a consent motion seeking to reduce the forfeiture money judgment amount by

$150,000 to account for "a partial payment to the victim as compensation for its loss."  Consent

Motion for Final Order of Forfeiture, Crim. ECF No. 17.  On December 12, 2012, the Court

granted the consent motion, entering a Final Order of Forfeiture forfeiting $239,069 to the

United States in the form of a money judgment pursuant to 18 U.S.C. § 981(a)(1)(C) and 28

U.S.C. § 2461(c).  *See* Final Order of Forfeiture, Crim. ECF No. 22.

### E.  Procedural History and Ancillary Criminal Forfeiture Proceeding

On February 28, 2013, the Government commenced the present action under the FDCPA,

which seeks to avoid the transfers of the Cash, Securities, and the Windover Property as

fraudulent.  During the litigation of this case, the Government also sought and obtained an

amendment to the Order of Forfeiture in the criminal case against Ms. Preston which included

the Cash and the Securities as substitute property subject to forfeiture pursuant to 21 U.S.C. §

853(p).[7]  *See* Fourth Amended Order of Forfeiture, Crim. ECF No. 43.  Mr. Preston filed a

---

[7]      Weeks before commencing the present action under the FDCPA, the Government filed a
motion in the criminal case to amend the Order of Forfeiture to include the Windover Property.
*See* Gov't's 2d Mot. Amend Order Forfeiture, Crim. ECF No. 33.  That motion remains pending.

petition asserting his interest in both the Cash and the Securities, and his daughter, Laura

Preston, filed a petition asserting her interest in the Securities, commencing an ancillary

proceeding in the criminal case pursuant to 21 U.S.C. § 853(n).  The Court dismissed those

petitions.  *See* Order, Crim. ECF No. 74; Order, Crim ECF No. 77.  The Government and Mr.

Preston filed their motions for summary judgment in this case prior to the Court's dismissal of

the petitions in the criminal case.

## III.  ANALYSIS

The Government's Amended Complaint in this action seeks, with respect to the

Windover Property, an order either avoiding the transfer of Ms. Preston's interest in the

Windover Property in 2012 and restoring title to the property as it was held prior to April 2012 or

directing Mr. Preston to "execute a deed sufficient to restore the joint tenancy of both Defendants

in the Windover Property" pursuant to the FDCPA.  Am. Compl. at 5 ¶ 2.  The Government also

seeks a surcharge in accordance with 28 U.S.C. § 3011.[8]  *See id.* at 5 ¶ 5.  The Government

argues that it is entitled to summary judgment because, in making the transfer, Ms. Preston had

actual intent to hinder, delay, or defraud under 28 U.S.C. § 3304(b)(1)(A), or, in the alternative,

because the transfer was constructively fraudulent under 28 U.S.C. § 3304(b)(1)(B).  *See* Pl.'s

Mem. Supp. at 14.  Mr. Preston argues that he is entitled to summary judgment because the

---

[8]     The statute provides that "[i]n an action or proceeding under subchapter B or C [of the FDCPA], and subject to subsection (b), the United States is entitled to recover a surcharge of 10 percent of the amount of the debt in connection with the recovery of the debt, to cover the cost of processing and handling the litigation and enforcement under this chapter of the claim for such debt."  28 U.S.C. § 3011(a).  The Amended Complaint states that the Government brings this action pursuant to 28 U.S.C. § 3301 *et seq.* concerning fraudulent transfers involving debts, which is subchapter D of the FDCPA.  It appears, therefore, that the surcharge provision may be inapplicable here.  Neither the Government nor Mr. Preston address the surcharge provision in their motions or oppositions.

Government cannot prove either theory and because, even if the Government were successful, Ms. Preston would not have any equitable interest in the Windover Property under Virginia law.[9] *See* Def.'s Mem. Supp. at 1–3.  The Court addresses these theories below.

As a preliminary matter, however, the Court addresses the Government's requests for relief as to the Cash and the Securities.  The Government's Amended Complaint seeks, pursuant to the FDCPA, an order either avoiding "the transfer of Nancy Preston's interest" in her Merrill Lynch account and restoring title to the account as it was prior to January 2012 or directing Mr. Preston to execute a transfer from the Trust Account "sufficient to restore commensurate value" to Ms. Preston's Merrill Lynch account prior to the January 2012 transfers of the Cash and the Securities.  Am. Compl. at 5 ¶ 4.  As a result of the Court's order dismissing Mr. Preston's and Laura Preston's petitions in the criminal case's ancillary proceeding, however, the Government now has "clear title" to the Cash and the Securities.  21 U.S.C. § 853(n)(7).  Therefore, the Government's requests for relief with respect to the Cash and the Securities are moot and the Court considers only the Government's claim as it concerns the Windover Property.[10]

## A.  Legal Standard for Summary Judgment

A court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[9]     The FDCPA also provides that "[a] transfer or obligation is not voidable under section 3304(b) with respect to a person who took in good faith and for a reasonably equivalent value or against any transferee or obligee subsequent to such person."  28 U.S.C. § 3307(a).  Mr. Preston does not argue—either in opposition to the Government's motion for summary judgment or his motion for summary judgment—that this exception is applicable here.

[10]     The circumstances concerning the transfers of the Cash and the Securities may nonetheless be relevant to the issue of whether Ms. Preston had actual intent to hinder, delay, or defraud a creditor when she transferred her interest in the Windover Property.  *See* 28 U.S.C. § 3304(b)(2)(G) (providing that, in determining actual intent, a court may consider whether "the debtor removed or concealed assets").

R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See id.* at 323.  In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial.  *See id.* at 324.  In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255.  Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### B.  "Actual Intent" under Section 3304(b)(1)(A)

Section 3304(b)(1)(A) of the FDCPA provides, in relevant part, that a transfer made by a debtor is fraudulent as to a debt to the United States if the debtor makes the transfer "with actual intent to hinder, delay, or defraud a creditor."  28 U.S.C. § 3304(b)(1)(A).  It is undisputed that

Ms. Preston is a debtor to the United States and that she transferred her interest in the Windover

Property in April 2012.  For purposes of summary judgment, therefore, the Court must determine

whether there is a dispute of material fact as to whether Ms. Preston had "actual intent to hinder,

delay, or defraud" the United States or another of her creditors in making that transfer.

The statute provides a non-exhaustive list of factors that the Court may consider in

determining whether Ms. Preston had actual intent, including whether:  the transfer was to an

"insider"; the debtor retained possession or control of the property after the transfer; the debtor

had been threatened with suit prior to the transfer; the transfer occurred shortly before or shortly

after a substantial debt was incurred; the transfer was of substantially all of the debtor's assets;

and the value of the consideration received by the debtor was reasonably equivalent to the value

of the property transferred.  *See* 28 U.S.C. § 3304(b)(2).

The Government argues that the circumstances of Ms. Preston's transfer of her interest in

the Windover Property satisfy most of the key factors, pointing to the facts and circumstances of

*United States v. Sherrill*, 626 F. Supp. 2d 1267 (M.D. Ga. 2009), a case involving a debtor who

transferred his interest in various real estate he jointly owned with his wife to his wife while he

was under investigation by the Securities and Exchange Commission, as "strikingly similar."

Pl.'s Mem. Opp. at 9–15.  *See also* Pl.'s Mem. Supp. at 15–21.  Mr. Preston does not specifically

address the statutory factors in his motion and in his opposition to the Government's motion.

Instead, he largely focuses on the Prestons' explanations for the 2008 and 2012 transfers, which

are relevant to multiple factors.  The Court addresses each of the relevant factors in order to

determine whether there is a genuine dispute of material fact as to whether Ms. Preston had

actual intent.

### 1.  Transfer to an "Insider"

Ms. Preston's transfer of the Windover Property was undisputedly to an insider.  The statute defines "insider" to include a relative of the debtor and defines a spouse to be a relative. *See* 28 U.S.C. § 3301(5)(A)(i); *id.* § 3301(5).[11]  Mr. and Ms. Preston were married at the time of the transfer and they continue to be married.  This factor weighs in favor of a finding that Ms. Preston had actual intent, though it is far from sufficient.

### 2.  Possession or Control of the Property

Mr. Preston does not contest that Ms. Preston maintained her possession of the Windover Property after the transfer in 2012 by continuing to live there.  With respect to control of a property, courts have considered whether the debtor contributed towards the mortgage payments on the property.  *See, e.g., Sherrill*, 626 F. Supp. 2d at 1273 (concluding that the debtor "retained a sufficient degree of possession and control" of the real properties because he continued to contribute towards the mortgage payments on the properties and continued to live at one of the properties).  In this case, there is a genuine dispute as to whether Ms. Preston's monthly payments to Mr. Preston of $2,500 from one joint account to another joint account were contributions towards the mortgage on the Windover Property.  Control is not, of course, solely determined by equity.  For example, a renter without equity may nevertheless have some degree of control of the property.  The Prestons claim that Ms. Preston's monthly payments of $2,500, which continued after she transferred the property in April 2012, were intended to cover, among other things, utilities and personal property taxes.  *See* Mr. Preston's Feb. 2015 Aff. ¶¶ 23–25; Ms. Preston's Feb. 2015 Aff. ¶¶ 23–24.  It appears, therefore, that Ms. Preston maintained some

---

[11]     The statute erroneously contains two subsections numbered (5), the first defining "insider" and the second defining "relative."

degree of control, in addition to possession, over the Windover Property following the April

2012 transfer.  This factor, on the undisputed facts before the Court, also weighs towards a

finding of actual intent, though it is insufficient.

       3.  Threat of Suit and Proximity in Time to Incurrence of a Substantial Debt

At the time that Ms. Preston transferred her interest in the Windover Property, the

Government had not yet formally brought any legal action against her concerning her

embezzlement from Clyde's.  It is undisputed, however, that she had confessed to the FBI that

she had embezzled more than $600,000 from her employer three months before the transfer and

that she retained a criminal defense attorney following her confession.  *See* Stip. Regarding

Testimony SA Mark Stanley.  Ms. Preston was clearly aware of a "threat of suit" at the time of

the transfer.  *See Sherrill*, 626 F. Supp. 2d at 1273 (finding that the debtor was aware of a threat

of suit in part because he "knew he was being investigated by the SEC").  The threat of suit

against Ms. Preston was realized shortly after she transferred her interest in the Windover

Property when the Government filed a Criminal Information against her in August 2012.  *See*

Information, Crim. ECF No. 1.  Less than six months after the transfer, this Court entered a

Consent Order of Forfeiture forfeiting $389,069 to the United States in the form of a money

judgment.  *See* Consent Order of Forfeiture, Crim. ECF No. 9.

Unlike the debtor in *Sherrill*, however, Ms. Preston's own factual account indicates that

the proximity in timing was not coincidental.  She claims that she transferred her interest because

it became clear that, as a result of her impending criminal charges and restitution obligations, she

would be unable to pay Mr. Preston for her interest in the Windover Property.  *See* Ms. Preston's

Feb. 2015 Aff. ¶ 21.  As discussed, *infra*, with respect to consideration, there is a genuine dispute

as to whether the reason for transferring her interest concerned the Prestons' purported

agreement in 2008.  Of course, even assuming the veracity of Ms. Preston's explanation, there remains an open question as to why she felt it was necessary to transfer title when she realized that she would be unable to pay Mr. Preston, as she had not paid him in the three years prior and does not claim that, under their agreement, she was obligated to pay him within a certain time frame or return the title to him in the event that she could not pay.  Nevertheless, the weight to be afforded to this factor largely depends on a genuine dispute and is therefore of little use at summary judgment.

### 4.  Substantially All of Debtor's Assets

The Government asserts that Ms. Preston's transfers of the Windover Property, the Cash, and the Securities constituted substantially all of her assets but does not articulate whether Ms. Preston's transfer of the Windover Property by itself constituted substantially all of her assets. *See* Pl.'s Mem. Supp. at 21; Pl.'s Opp. at 12.  As support for its argument, the Government cites Ms. Preston's deposition testimony in January 2013 in which she discussed her bank accounts, jewelry, and cars.  *See* Nancy Preston Dep.  Mr. Preston does not address this factor, let alone dispute the Government's assertions.  It is unclear, however, whether Ms. Preston's testimony concerned the value of her assets at the time she transferred the Windover Property in April 2012.  Ms. Preston's title to the Windover Property appears to have been a major asset and possibly her largest asset.  In her deposition, Ms. Preston estimated that the value of the property was $1 million, which Mr. Preston does not challenge.  *See id.* at 11:23–25.  Ms. Preston did not discuss any similarly valuable assets.  Therefore, while the Court cannot find that Ms. Preston's transfer of title in the Windover Property constituted substantially all of her assets, the significant value of her title in the property further weighs in favor of a finding of actual intent.

5.  Value of the Consideration

Whether the consideration that Ms. Preston received for her transfer of title in 2012 was reasonably equivalent to the value of the interest she transferred is the most important factor in the Court's analysis of whether Ms. Preston had actual intent, because the resolution of this issue turns on the viability of the Prestons' entire explanation for the transfer.

As discussed, the Prestons claim that, in exchange for Mr. Preston's conveyance of the Windover Property to himself and Ms. Preston as tenants by the entirety in November 2008, Ms. Preston agreed to pay him for her joint interest when they combined their finances, which never occurred.  *See* Mr. Preston's Feb. 2015 Aff. ¶¶ 19–20; Ms. Preston's Feb. 2015 Aff. ¶¶ 18–19. They also claim that Ms. Preston transferred her joint interest back to Mr. Preston in April 2012 when it became clear to her that she would not be able to pay him for her interest as they had agreed in 2008.  *See* Ms. Preston's Feb. 2015 Aff. ¶¶ 20–22; Mr. Preston's Feb. 2015 Aff. ¶¶ 21– 23.  By making these claims, the Prestons are effectively claiming that the consideration that Ms. Preston received in exchange for transferring her interest in 2012 was the release of Mr. Preston's potential claim against Ms. Preston for the value of the interest in connection with the transfer in 2008.  *See* 28 U.S.C. § 3303(a) (providing that "value" may be satisfaction of an antecedent debt).  Therefore, the Court must determine whether there is a genuine dispute as to whether Ms. Preston received that consideration.

The Government urges the Court to apply Virginia's "plain meaning" rule for interpreting deeds conveying interests in real property.  Under that rule, "[w]hen the language in a deed is clear, unambiguous, and explicit, a court called upon to construe such language should look no further than the four corners of the deed itself."  *Forster v. Hall*, 576 S.E.2d 746, 750 (Va. 2003) (citation omitted).  *See also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 75

F.3d 648, 655 (Fed. Cir. 1996) ("Once a court determines that a 'deed [is] clear and

unambiguous, it [is] required to focus upon the language of the deed and *from that source alone*,

construe its meaning.'" (quoting *Trailsend Land Co. v. Va. Holding Corp.*, 321 S.E.2d 667, 670–

71 (Va. 1984)).  Courts most commonly use the plain meaning rule to interpret a deed's

description of the property being conveyed and the meaning of a deed's restrictive covenants and

easements.  *See, e.g., Forster*, 576 S.E.2d 746 (determining whether landowners were in

violation of a restrictive covenant regarding mobile homes); *Irby v. Roberts*, 504 S.E.2d 841 (Va.

1998) (determining how the language of an easement applied to the construction of a pier);

*Richmond*, 75 F.3d at 655 (determining the duration of a restrictive covenant).

 The plain meaning rule is inapplicable here, because the Court is not called upon to

construe the meaning of the language of the 2008 Deed of Gift or the 2012 Deed of Gift.  Rather,

Mr. Preston argues that the deeds do not reflect the actual consideration received, as permitted by

Virginia law.  As he notes, Virginia's Form of Deed provides that deeds may describe "nominal"

consideration, rather than the "actual" consideration:

> Every deed . . . may be made in the following form, or to the same
> effect:  'This deed, made the …….. day of ……., in the year
> ………., between (here insert names of parties as grantors or
> grantees), witnesseth:  that in consideration of (*here state the
> consideration, nominal or actual*) . . . .

Va. Code. Ann. § 55-48 (emphasis added).  Indeed, over a century ago, the Supreme Court of

Appeals of Virginia stated that it was "settled law that the consideration actually paid, or

promised, can be shown to have been other than that recited in the instrument" and that "the deed

need not contain all the stipulations of the parties," such as "agreements as to the consideration."

*Trout v. Norfolk & W. Ry. Co.*, 59 S.E. 394, 397 (Va. 1907) (internal quotation omitted).  The

Court distinguished this from the parol evidence rule, which it said bars the use of parol evidence

"to alter or contradict the legal import of a deed," explaining that a deed "purports to be the deed

of but one of the parties" and "purport[s] to contain the covenants of the grantor in respect to the property conveyed." *Id.* (internal quotation omitted). *Trout* essentially stands for the well-settled, general rule that "the true, real, or actual consideration of a deed of conveyance may be inquired into, and shown by, parol or extrinsic evidence . . . .  even though the true or actual consideration may be other than, or different from, that recited in the deed." 32A C.J.S. *Evidence* § 1494 (2015).  *See also* 32A C.J.S. *Evidence* § 1495 (2015) ("It is ordinarily permissible to introduce evidence to show that the consideration for a deed was greater than that expressed in the instrument, such as where the consideration specified was purely nominal . . . . It has also been stated that the recital of a consideration in a deed does not preclude either party from showing an additional consideration, even if such consideration was orally made."). Accordingly, the Court is not limited to the language of the deeds to determine whether Ms. Preston received consideration of a reasonably equivalent value.

The 2012 Deed of Gift reflects only nominal consideration, if any at all, in connection with the conveyance.  It states in its text that the conveyance was "for and in consideration of the sum of Ten Dollars ($10.00), receipt whereof is hereby acknowledged," but the accuracy of that statement is questionable, as it separately states near the top of the document that consideration is "None." 2012 Deed of Gift.  The text of the 2008 Deed of Gift states that the property was conveyed "without consideration" and, near the top of the document, it states that consideration is "None."  2008 Deed of Gift.  It also states that the conveyance is "Exempt from Recordation Tax under § 58.1-811.D of the Code of Virginia," which concerns deeds of gift without consideration.  *Id.*  In support of their factual claims that neither deed reflected the actual consideration for the conveyances, Mr. and Ms. Preston submit sworn affidavits.  As discussed, the Prestons do not submit any contemporaneous evidence of this purported consideration or any

statements from third party witnesses supporting their claim.  They also do not explain why the deeds were recorded as deeds of gift.  As support for the related claim that the Prestons continued to maintain separate finances, however, Mr. Preston does submit copies of monthly checks for $2,500 signed by Ms. Preston from a Bank of America account jointly held by Mr. and Ms. Preston made to and endorsed by Mr. Preston.  *See* Def.'s Mot. Summ. J. Ex. 16, ECF No. 46-17.

The Government, for its part, provides little evidence to counter the Prestons' factual claims apart from its reliance on the language of the deeds.  The Government cites the deposition testimony of Victoria Griffith, who claimed to have had at least one conversation with Ms. Preston concerning the Prestons' decision to put Ms. Preston's name on the title to the Windover Property in 2008.  *See* Pl.'s Mem. Supp. at 7.  But Ms. Griffith only testified that she understood from Ms. Preston that, around the same time that the Prestons decided to refinance the Windover Property to construct an additional garage and an apartment, Ms. Preston's name would be put on the title.  *See, e.g.,* Griffith Dep. at 28:11–15.  The Government cites no testimony from Ms. Griffith or any other witness claiming to have knowledge as to whether the Prestons agreed that Ms. Preston would pay Mr. Preston in exchange for him putting her name on the title or claiming to have any knowledge concerning Ms. Preston's conveyance in 2012, the transfer that is primarily at issue in this case.  The Prestons dispute Ms. Griffith's testimony, both stating that they never discussed the Windover Property with her at any time.  *See* Ms. Preston's Apr. 2015 Aff. ¶ 5; Mr. Preston's Apr. 2015 Aff. ¶ 10.

To challenge the Prestons' factual claims regarding the separation of their finances, the Government provides evidence that many of Ms. Preston's bank accounts, including the Bank of America account she used to pay Mr. Preston each month, were joint accounts in both of their

names.  *See* Ross Decl.  The Government also argues that the timing between the monthly

payments from Ms. Preston to Mr. Preston and Mr. Preston's monthly payment of the mortgage

suggests that Ms. Preston's checks could have been intended for the mortgage payments.  *See*

Pl.'s Mem. Supp. at 7; Pl.'s Opp. at 16–17.  But the Government's argument is pure conjecture;

it is equally possible that the payments, which appear to have been in an amount that was more

than half of the monthly mortgage payments,[12] were for monthly expenses, as the Prestons claim,

that were due around the same time as the mortgage payments.  Even Ms. Griffith, who testified

that Ms. Preston told her that "she was generally responsible for helping to finance and pay for

the house" and that Mr. Preston was dependent on her to "pay for things for the house," also

testified that she did not know if Ms. Preston contributed towards the mortgage on the Windover

Property.  Griffith Dep. at 34:20–35:1.

   The evidence before the Court is not "so one-sided that one party must prevail as a matter

of law."  *Anderson*, 477 U.S. at 251–52.  A reasonable factfinder could find that, in 2008, Ms.

Preston agreed to pay her husband for a joint interest in the Windover Property upon the

consolidation of their finances and that, in 2012, Ms. Preston realized that she would be unable

to consolidate her finances or pay Mr. Preston for her interest due to her impending criminal

charges and restitution obligations and therefore transferred her interest back to Mr. Preston in

exchange for releasing his potential claim against her for the amount she owed.  In making those

findings of fact, the factfinder might view the Prestons' testimony as credible, by considering

that, among other things:  the Prestons had individual careers prior to and during their marriage;

Mr. Preston owned the Windover Property for more than 20 years before he married Ms. Preston

---

[12]  A schedule listing the monthly payments of $2,500 and the mortgage payments prepared
by the Government indicates that the mortgage payments ranged from $3,263.32 to $3,755.51
between January 2011 and January 2013.  *See* Ross Decl. at 48–50.

and waited nearly four years after their marriage before conveying a joint interest; and Ms.

Preston wrote a check to her husband for $2,500 each month.  Another reasonable factfinder,

however, could find that Mr. Preston added his wife's name to his property as a gift in 2008 and

that when it became clear in 2012 that Ms. Preston's assets would soon be subject to forfeiture

due to her criminal activity, she gave the interest back without receiving any value in exchange.

In making those findings of fact, the factfinder might view the Prestons' testimony as unreliable,

by considering that, among other things:  the deeds in 2008 and 2012 were filed as deeds of gift

describing only nominal, if any, consideration; the Prestons failed to present any supporting

contemporaneous evidence or testimony from third party witnesses; the Prestons appear to have

held joint back accounts; and Ms. Preston transferred her interest, possibly her most valuable

asset, to her husband within months of confessing to embezzlement.

These are genuine disputes of fact that are crucial to the question of whether Ms. Preston

had actual intent to hinder, delay, or defraud when she transferred her interest in the Windover

Property to Mr. Preston in April 2012.  Accordingly, neither the Government nor Mr. Preston are

entitled to summary judgment as to the transfer of the Windover Property under 28 U.S.C. §

3304(b)(1)(A).

### C.  "Constructive Fraud" under Section 3304(b)(1)(B)

The Government argues in the alternative that Ms. Preston's transfer of her interest in the

Windover Property in April 2012 is avoidable under Section 3304(b)(1)(B), which provides that

a transfer by a debtor is fraudulent as to a debt to the United States if, regardless of whether the

debtor had actual intent to hinder, delay, or defraud, the debtor did not receive a reasonably

equivalent value in exchange for the transfer and, in relevant part, "intended to incur, or believed

or reasonably should have believed that he would incur, debts beyond his ability to pay as they

became due." 28 U.S.C. § 3304(b)(1)(B). Some courts have referred to this provision as addressing cases of "constructive fraud." *E.g., United States v. Schippers*, 982 F. Supp. 2d 948, 964 (C.D. Iowa 2013).

As discussed with respect to actual intent, there is a genuine dispute as to the factual question of whether Ms. Preston received a reasonably equivalent value in exchange for the transfer of her interest in the Windover Property to Mr. Preston in April 2012—the first required element of a claim under Section 3304(b)(1)(B). With this factual element in genuine dispute, neither party is entitled to summary judgment.

**D. Virginia's Law Governing the Equitable Distribution of Property Upon Divorce**

Finally, the Court addresses Mr. Preston's meritless argument that he is entitled to summary judgment, because, even if the Government is successful in this case in avoiding the April 2012 transfer of the Windover Property, Ms. Preston would have no equitable interest in the property due to her alleged failure to contribute to the mortgage on the property from her separate funds "during her brief period of ownership." Def.'s Mem. Supp. at 2–3. *See also id.* at 12–13.

As the sole support for his legal argument, Mr. Preston cites *Hart v. Hart*, 497 S.E.2d 496 (Va. Ct. App. 1998). *See* Def.'s Mem. Supp. at 12–13. Mr. Preston neglects to mention, however, that *Hart* concerned the interpretation of Virginia's divorce laws governing the equitable distribution of "hybrid property" (i.e., property that is part separate and part marital) following a divorce. *See Hart*, 497 S.E.2d at 504–06. How a Virginia court might equitably determine to distribute the Windover Property between the Prestons in a hypothetical divorce—a highly fact-specific determination based on a variety of factors not relevant to this case—has no bearing as to whether Ms. Preston's transfer of her interest in the property to Mr. Preston is

avoidable pursuant to the FDCPA.  Mr. Preston provides no legal authority suggesting that

Virginia's laws governing the equitable distribution of property upon a divorce are applicable

here.  Indeed, the relevant Virginia statute appears to be limited by its own terms to divorce

proceedings.  *See* Va. Code Ann. § 20-107.3(A) (stating that the court shall classify property as

separate, marital, or hybrid "[u]pon decreeing the dissolution of a marriage, and also upon

decreeing a divorce from the bond of matrimony, or upon the filing with the court . . . of a

certified copy of a final divorce decree").

Moreover, even if Virginia's divorce laws were applicable, Mr. Preston does not argue

that the Windover Property would be classified as hybrid property, which appears to turn on

whether Mr. Preston's conveyance to Ms. Preston in 2008 was a gift, one of the central issues of

fact in genuine dispute in this case.  *See* Va. Code. Ann. § 20-107.3(A)(3)(f) ("When separate

property is retitled in the joint names of the parties, the retitled property shall be deemed

transmuted to martial property.  However, to the extent that the property is retraceable by a

preponderance of the evidence and was not a gift, the retitled property shall retain its original

classification.").  Finally, the Court notes that even if Virginia's laws concerning the equitable

distribution of hybrid property upon divorce were applicable, the issue of whether Ms. Preston

made any payments towards the mortgage of the Windover Property or made any capital

improvements to the property also remains in genuine dispute.

Mr. Preston is not entitled to summary judgment on this basis.


## IV.  CONCLUSION

For the foregoing reasons, the Court will deny both the Government's Motion for

Summary Judgment (ECF No. 47) and Defendant James W. Preston's Motion for Summary

Judgment (ECF No. 46).  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  August 24, 2015                                    RUDOLPH CONTRERAS
                                                           United States District Judge